ARENTSEN, Appellant, vs. MORELAND and another, Respondents.

SAME, Respondent, vs. SAME, Appellants.

*February 23—June 10, 1904.*

*Vendor and purchaser: Contract construed: Growing timber: Failure to convey title: Measure of damages.*

1. Defendants purchased the timber on about 8,500 acres belonging to a lumber company, with the privilege of removing said timber within five years, and the right to purchase, at the end of the five years, the land itself at $2.50 per acre with interest and taxes added, deducting the amount paid for the timber. They sold to third persons the timber on about 7,800 acres, to be removed by the end of the five years mentioned. Afterwards, during the five years, they contracted to sell to plaintiff for $3 per acre all the lands they then controlled belonging to said lumber company, "being about 8,500 acres." *Held*, that this contract called for a conveyance of the title to the lands, including the timber thereon.

2. A vendor who agrees to convey what he at the time knows he has no right to convey because the title is in another, thereby assumes the risk of acquiring the title and making the conveyance, or responding in damages for the purchaser's loss of the bargain, even though the latter knew at the time of making the agreement that the vendor had no title.

APPEALS from a judgment of the circuit court for Sawyer county: JOHN K. PARISH, Circuit Judge.    *Reversed.*

This action was commenced October 16, 1903, to recover $37,926, damages alleged to have been sustained for the breach of the written contract of which the following is a copy:

"This agreement, entered into this 4th day of July, 1903, by and between Moreland & Pugh, of Hayward, Wisconsin, parties of the first part, and *Geo. L. Arentsen,* of Hayward, Wisconsin, party of the second part, witnesseth: The party of the first part agrees to give the party of the second part an option of ninety days (90) on all the lands they now control, belonging to the North Wisconsin Lbr. Co., excepting the west ½ of the N. W. ¼ Sec. 24, all the above lands situated in town 43, R. (8) west, Bayfield county, Wisconsin, about (8,500) acres.    Consideration of the above option is to be three hundred dollars ($300).

"One hundred ($100) in hand paid.

"One hundred ($100) in thirty (30) days from date.

"One hundred ($100) in sixty (60) days from date.

"The purchase price of the above lands is to be three dollars ($3.00) per acre.

"MORELAND & PUGH.    [Seal.]

"GEO. L. ARENTSEN.    [Seal.]

"Witness:

    "F. L. Clark.

    "C. P. Hendrickson."

After alleging the making of such contract, the complaint alleges, in effect, the payment by the plaintiff of $100 at the time of the delivery of the contract, $100 July 8, 1903, and the last instalment of $100 therein mentioned soon after the last-mentioned date, and prior to September 3, 1903; that a short time prior to September 26, 1903, the plaintiff, under the option in the contract, elected to purchase the lands therein referred to, pursuant to the terms thereof, and so notified the defendants; that on the day and year last mentioned the plaintiff was ready, able, and willing to purchase from the defendants the lands described in the option contract, pur-

suant to the terms thereof, and personally demanded of the defendants the conveyance of the lands therein mentioned, and then and there offered to the defendants to accept a conveyance of the lands, and to pay the consideration in the option contract mentioned therefor, and in all other respects to fulfill said option agreements on his part; that the defendants then and there refused to convey, and refused to furnish a conveyance of, said lands to the plaintiff, and declared then and there that they had so incumbered the said lands by a contract of sale of all saw timber thereon that they were unable to convey said lands except by a conveyance reserving and excepting therefrom the saw timber thereon; that the land mentioned in said option contract is timber land, and chiefly valuable on account of the standing saw timber thereon; that the defendants could not, September 26, 1903, nor since, nor can they now, convey a marketable title, nor cause to be conveyed a marketable title, to said lands, but on the contrary the title to said lands was at all said times, and still is, incumbered by the contract of sale to Rogan Bros., of Cable, Wisconsin, of all of the saw timber on about 7,800 acres of said lands, by which contract said defendants had sold to said Rogan Bros., for a consideration of $5,000, all the saw timber on about 7,800 acres of said lands, granting to said Rogan Bros. three years from July 21, 1902, in which to remove said timber from said lands; and by reason of the refusal, neglect, and failure of the defendants to convey or cause to be conveyed said lands to the plaintiff, and the defendants' refusal, neglect, and failure to comply with the terms of said option contract on their part, the plaintiff has been damaged in the sum of $37,926, for which amount he demands judgment, with costs.

The defendants answered by way of admissions, denials, and counter allegations, to the effect that July 21, 1900, the defendants entered into a contract with the North Wisconsin Lumber Company, the owner in fee simple of the lands

in question, for the purchase thereof, a copy of which is annexed and made a part thereof, and marked "Ex. A," and which contained a specific description of the lands thereby affected, amounting to 8,508 acres; that the defendants had fully complied with the terms of their contract with the North Wisconsin Lumber Company, and the same was still in full force and effect; that by the terms of that contract, and in consideration of $5,000 therein agreed to be paid by the defendants, the North Wisconsin Lumber Company sold to the defendants, and warranted the title to them of, all the timber on the lands so described therein, with the privilege of entering thereon for five years to remove the timber; that such contract was to be closed by limitation July 21, 1905, and the defendants on said last-mentioned date were to have the privilege of purchasing the North Wisconsin Lumber Company's title to the lands listed at $2.50 per acre, as of July 21, 1900, with interest at six per cent., and taxes from that date, less the payment of $5,000, and interest at the same rate. The answer admits the making of a contract for the sale of the timber with Rogan Bros., and alleges, in effect, that September 13, 1902, they sold and conveyed to Rogan Bros. all the saw timber situated upon the lands specifically described in their contract with them, a copy of which is thereto annexed and made a part thereof, and marked "Ex. B," and that the same was still in full force. By the terms of that contract the defendants, in consideration of $5,000 to be paid by Rogan Bros., agreed to sell to them, and warrant the title to, all the saw timber on the lands therein described, with the privilege of entering thereon to remove said timber until July 21, 1905, when the contract was to be closed by limitation.

The defendants, further answering, allege, in effect, that, at the time of making the optional agreement with the plaintiff, he had full notice and knowledge of the defendants' contract (Exhibit A) with the North Wisconsin Lumber Com-

pany and the defendants' contract (Exhibit B) with Rogan Bros., and of all the rights of all parties thereunder; that the optional agreement of the defendants with the plaintiff was intended by the parties thereto to be an option to purchase all the right, title, and interest of the defendants in and to the lands, and no more; that at the time of making the optional agreement with the plaintiff, July 4, 1903, the defendants only controlled such lands belonging to the North Wisconsin Lumber Company as were described in Exhibit A, and they were subject to the rights of Rogan Bros. under Exhibit B, all of which was well known to the plaintiff; that the defendants have at all times been ready and willing to convey and execute and deliver to the plaintiff a quitclaim deed of the lands described in Exhibit A, or to assign that contract to the plaintiff, subject only to their contract (Exhibit B) with the Rogan Bros.

By way of counterclaim, the answer alleges, in effect, that July 21, 1900, the North Wisconsin Lumber Company was the owner in fee simple, free and clear of all liens and incumbrances, of the lands described in Exhibit A; that on that day the defendants made that contract with that company; that September 13, 1902, they made the contract (Exhibit B) with Rogan Bros.; that July 4, 1903, they made the optional contract with the plaintiff, who had full notice and knowledge of the contracts, Exhibit A and Exhibit B, and of all the rights of all parties thereto and thereunder; that the plaintiff had paid to the defendants the $300 pursuant to said optional agreement, and on or about September 26, 1903, notified the defendants of his election to purchase the lands pursuant to that agreement; that thereupon the defendants tendered to the plaintiff a warranty deed for said lands, subject to the contract (Exhibit B) with the Rogan Bros., which the plaintiff refused to accept, or to pay for the lands, and neglects and refuses to comply with the terms of the agreement; that prior to the commencement of

this action the defendants tendered to the plaintiff a deed of the premises, pursuant to the agreement, which the plaintiff refused to accept and to pay the purchase price, for which they demand judgment for $25,260 damages for breach of contract.

The plaintiff, by way of reply to such counterclaim, admitted that at the time of making the optional agreement with the defendants, July 4, 1903, he had knowledge of the existence of the defendants' contract (Exhibit A) with the North Wisconsin Lumber Company, but specifically denies that he had notice or knowledge of their contract (Exhibit B) with the Rogan Bros. until long after the making of the optional agreement of July 4, 1903; that September 26, 1903, the defendants offered to deliver to the plaintiff a deed of a certain interest in said lands by the North Wisconsin Lumber Company, subject to the contract with the Rogan Bros., and subject to all the incumbrances they may or might have created or placed against the lands since July 21, 1900, which plaintiff refused to accept. And save as mentioned, or otherwise controverted, the plaintiff denies each and every allegation contained in the counterclaim.

The cause having come on for trial, and a jury having been impaneled and sworn, the defendants moved upon the pleadings for judgment as prayed for in their counterclaim, whereupon it was ordered by the court that judgment be entered as follows: "It is ordered and adjudged that the contract set out in the complaint herein be, and hereby is, canceled and rescinded, and that the plaintiff do have and recover of the defendants the sum of $304.50, principal and interest, as damages, and $64.99 as costs—in all, $369.49." From the judgment so entered, both parties appeal to this court.

For the plaintiff the cause was submitted on the brief of *J. F. Riordan* and *Harold Harris.*

For the defendants there was a brief by *Tomkins, Tomkins & Garvin,* and oral argument by *W. M. Tomkins.* They

contended, *inter alia,* that this option contract was only for lands which at its date were *controlled* by the defendants and *belonging* to the North Wisconsin Lumber Company. Standing timber is held in this state to be lands. *Daniels v. Bailey,* 43 Wis. 569; *Lillie v. Dunbar,* 62 Wis. 198; *Seymour v. Cushway,* 100 Wis. 580. The defendants did not *control* the standing timber on these lands at the time of the contract with plaintiff, as they had sold and conveyed it prior to that time. Neither did the standing timber *belong* to the North Wisconsin Lumber Company, for it had conveyed that to the defendants. There are no implied covenants of title in an executory contract. Secs. 2204, 2242, Stats. 1898; *Koeber v. Somers,* 108 Wis. 497. The contract in question simply gives the plaintiff an option to purchase the rights of the defendants in and to the lands described. All he could demand was a quitclaim deed as of the date of the contract. While under the common law there was an implied covenant for good title, still the purchaser of land knowing the title to be defective took the risk upon himself. *Lighty v. Shorb,* 24 Am. Dec. 334; *Walker v. Quigg,* 31 Am. Dec. 452; *Rohr v. Kindt,* 39 Am. Dec. 53; *Newark S. Inst. v. Jones's Ex'rs,* 37 N. J. Eq. 449.

The following opinion was filed April 19, 1904:

CASSODAY, C. J. 1. It is conceded that the plaintiff paid the full consideration for the optional agreement, as therein prescribed. It is also conceded that, within the ninety days therein given to him within which to exercise his option, he elected to purchase the lands therein referred to, pursuant to the terms of that agreement, and so notified the defendants. By virtue of such payment and such election and notice, the optional agreement became an absolute contract, binding alike upon the plaintiff and the defendants. The first question for consideration is as to what property the defendants, by that contract, agreed to convey to the plaintiff.

By the terms of the contract, the defendants agreed to convey to the plaintiff "all the lands" they then controlled, "belonging to the North Wisconsin Lumber Company," and situated in the town mentioned, and being "about 8,500 acres," excepting one piece of eighty acres, described. As indicated in the foregoing statement, the defendants then held a contract from the North Wisconsin Lumber Company whereby that company had agreed to sell to them *"all the timber* on the" lands therein specifically described, amounting to 8,508 acres, with the privilege of entering upon the lands to remove such timber at any time before July 21, 1905, when the contract was to be closed by limitation. The plaintiff admits that he had knowledge of the existence of that contract on and prior to the time of his making the optional agreement with the defendants, July 4, 1903. It will be observed that, while the contract which the defendants held from the lumber company only gave them the right "to all the timber" on the lands therein described, their contract with the plaintiff purported to give to him the right to "all the lands" covered by the contract, being "about 8,500 acres." Of course, the agreement to sell the lands necessarily included the timber growing upon the lands. *Lillie v. Dunbar,* 62 Wis. 198, 22 N. W. 467; *Seymour v. Cushway,* 100 Wis. 590, 76 N. W. 769; *Mississippi River L. Co. v. Miller,* 109 Wis. 77, 85 N. W. 193. True, the contract with the plaintiff expressly limited his option to all such lands as the defendants "now control." But it is expressly admitted in the answer "that at the time of making said agreement all the lands controlled by these defendants, belonging to the North Wisconsin Lumber Company, were those under and pursuant to said Exhibit A" which the defendants had obtained from the lumber company July 21, 1900. As indicated, that contract only gave to the defendants the right to the *timber* upon the 8,508 acres of land therein described, with the privilege of entering thereon to remove the same prior to July 21, 1905, and with

the further privilege of five years' extension upon conditions therein named, or, in lieu of such extension, it gave to the defendants the privilege, to be exercised July 21, 1905, "of purchasing the North Wisconsin Lumber Co.'s title to the lands listed at $2.50 per acre as of date July 21, 1900, with interest at six per cent. and taxes from this date—less the payment of $5,000 and interest at same rate." In other words, such option gave to the defendants the right to purchase the title to the 8,508 acres of lands, including the timber, as of July 21, 1900, at $2.50 per acre, and in that event the $5,000 paid and to be paid for the timber was to be deducted as part of the purchase price. The answer, moreover, concedes that, nearly a year prior to the contract with the plaintiff, the defendants had sold and conveyed to the Rogan Bros. "all the saw timber" on nearly all the lands they so controlled, for which they received $5,000, being the same amount which the defendants were to pay for all the timber on all of such lands. The defendants refused to convey to the plaintiff, except subject to the contract with Rogan Bros., and the plaintiff refused to accept such a conveyance.

The construction which the defendants insist shall be put upon their contract with the plaintiff is that the plaintiff is bound to accept a conveyance of the 8,500 acres of lands mentioned in his contract, *without the timber,* and pay therefor $3 per acre; that is to say, upwards of $4,000 more than the defendants were to pay for the lands *with the timber,* making a difference on the value of the two contracts of more than $9,000. The agreement was to convey the lands mentioned, being "about 8,500 acres." This court has repeatedly held that an agreement, in general terms, to convey real estate, calls for a conveyance of the entire estate in the lands sold, by a good and sufficient deed. *Young v. Wright,* 4 Wis. 144; *Wright v. Young,* 6 Wis. 127; *Bateman v. Johnson,* 10 Wis. 1, 3; *Falkner v. Guild,* 10 Wis. 563; *Taft v. Kessel,* 16 Wis. 273. The contract in question does not seem to be ambigu-

ous, especially in view of the admissions of the parties, as to
the condition of the title. It called for a conveyance of the
title to "about 8,500 acres" of land, including the timber
thereon. The contract was not complied with by the tender
of a conveyance of the slight interest the defendants retained
after they had conveyed nearly all the timber they had pur-
chased of the lumber company to the Rogan Bros. We must
hold that by refusing to make such a conveyance the defend-
ants breached the contract.

2. The important question presented is as to the measure
of damages, if any, in consequence of such breach. At the
commencement of the trial the defendants moved for judg-
ment on the pleadings, and thereupon the court ordered and
adjudged that the plaintiff's contract with the defendants be
canceled and rescinded, and that the plaintiff recover back
from the defendants, as damages, what he had paid, with in-
terest. It was held at an early day in England that where
a person contracted for the purchase of real estate, and the
title proved bad, and the vendor, without fraud, was incap-
able of making a good title, the vendee could only recover
back what he had paid, with interest and costs, but nothing
for the loss of his bargain. *Flureau v. Thornhill,* 2 W. Bl.
1078. In a much later case, a man, who had not obtained a
conveyance, put up the lots for sale at auction, and engaged
to make a good title to the purchaser by a certain day, which
he was unable to do; and it was held that a purchaser of the
lots at auction might recover from the vendor not only the
expenses which he had incurred, but also damages for the
loss of his bargain. *Hopkins v. Grazebrook,* 6 B. & C. 31.
In a still later case, where the breach of the contract arose,
not from the inability of the vendors to make a good title, but
from their refusal to take the necessary steps to give the
vendee possession pursuant to their contract, the vendee could
recover not only the money paid and expenses, "but also dam-
ages for the loss of his bargain, and that the measure of dam-
ages was the profit which it was shown he could have had on

a resale." *Engel v. Fitch,* L. R. 3 Q. B. Cases, 314; *S. C.,* affirmed in the Exchequer Chamber, L. R. 4 Ct. Q. B. 659. The cases cited were reviewed and distinguished at great length in *Bain v. Fothergill,* L. R. 7 Eng. & Ir. App. Cas. 159–213. Twenty-five years after that decision, the cases cited were reviewed and distinguished by two of the most learned English jurists of the present time, and it was held that:

"A purchaser of leasehold property, which the vendor cannot assign without a license from his lessor, is entitled to damages (beyond return of the deposit, with interest and expenses) for loss of his bargain by reason of the vendor's omission to do his best to procure such license." *Day v. Singleton,* L. R. (1899) 2 Ch. Div. 320.

The trend of decisions in this country is much less liberal to the vendor than in England. 2 Suth. Dam. (3d ed.) § 579. In several jurisdictions, and notably Missouri, even good faith on the part of the vendor is not allowed to prevent the vendee from recovering damages for the loss of his bargain. 2 Suth. Dam. § 579, and cases there cited; *Hartzell v. Crumb,* 90 Mo. 629, 3 S. W. 59; *Matheny v. Stewart,* 108 Mo. 73, 78, 17 S. W. 1014. In New York it was held long ago that:

"The rule that a vendor who contracts to sell and convey real property in good faith, *believing he has a good title,* and, on discovering it to be defective, for that reason refuses or is unable to fulfill his contract, is, in an action against him by the vendee for the breach, liable for only nominal damages, should not be in any degree extended, but strictly limited to those cases coming wholly and exactly within it. And where a vendor contracts to sell lands, in which he *knows at the time he has not title or the power of conveyance,* he is bound to make good to the vendee the loss of the bargain through his default. Nor in such case does it excuse the vendor that he acted in good faith and believed when he entered into the contract that he should be able to procure a good title for his purchaser." *Pumpelly v. Phelps,* 40 N. Y. 59.

The late Chief Justice COOLEY, after reviewing the English and American cases in his terse manner, concludes that:

"The principle underlying these cases is that if a party enters into a contract to sell, knowing that he cannot make a title, he is remitted to his general liability, and the exception introduced by *Flureau v. Thornhill* does not apply. So if a person undertakes that a third party shall convey, and is unable to fulfill his contract, the authorities are that he shall pay full damages. Such contracts are speculative in character, and the party giving them understands the risk he assumes when the covenant is entered into. . . . There are also numerous cases which decide that if the vendor acts in bad faith—as if, having title, he refuses to convey or disables himself from conveying—the proper measure of damages is the value of the land at the time of the breach, the rule in such case being the same in relation to real as to personal property. . . . And the cases before referred to, in which a party undertook to sell that which he did not own and knew he could not control, may also, when the other party is not informed of the defect, be considered as involving a degree of bad faith, and have generally been so regarded by the courts." *Hammond v. Hannin,* 21 Mich. 374, 386, 387.

So it has been held in Ohio that when a vendor has title and refuses to convey, or when he disables himself from conveying by parting with his title, the rule of damages is the value when the conveyance ought to have been made. *Dustin v. Newcomer,* 8 Ohio, 49. To the same effect, *Warren v. Chandler,* 98 Iowa, 237, 243, 67 N. W. 242; *Plummer v. Rigdon,* 78 Ill. 222; *Tracy v. Gunn,* 29 Kan. 508. But it is unnecessary to multiply adjudications, of which there is a great variety. In a standard text-book it is said:

"While the general rule that the law aims to make compensation adequate to the real injury sustained, and to place the injured party, so far as money can do it, in the same position he would have occupied if the contract had been fulfilled, is recognized, it is relaxed in some jurisdictions, and an *exception* admitted in favor of the vendor who makes a contract to sell and convey in good faith, believing himself to be

the owner of the property, when he is afterwards incapable of performing by reason of a defect in his title of which he was not aware." 2 Suth. Dam. (3d ed.) § 578.

And again, leaving out what is inapplicable here.

"If the person selling is in default,—if he knew or should have known that he could not comply with his undertaking; . . . if he has only a contract of the owner to convey, or a bond for a deed; . . . if he makes his contract without title, in the expectation of subsequently being able to acquire it, and is unable to fulfill by reason of causes so known, as the want of concurrence of other persons, or if he has title and refuses to convey or disables himself from doing so by conveyance to another person—in all such cases he is beyond the reach of the principle of *Flureau v. Thornhill*, 2 W. Bl. 1078, and is liable to full compensatory damages, including those for the loss of the bargain." 2 Suth. Dam. (3d ed.) § 581.

Speaking of the rule of the early English case cited, another recent text-writer says:

"This rule, wherever it has been invoked as a rule, has never been favorably regarded by the courts, and seems to have been productive of a great diversity of opinion as to the grounds upon which it is based. It has been rejected by the supreme court of the United States, and is not recognized in many of the state courts, while in states where it obtains it is strictly limited to those cases coming wholly and exactly within it. But where the vendor contracts to sell lands which he knows at the time he has not the power to convey, he must abide by his contract and should be held to make good to the vendee any loss he may sustain by reason of its violation. Nor is it any excuse for the vendor, in such a case, that he may have acted in good faith and fully believed when he entered into the contract that he should be able to procure an acceptable title for his purchaser." 2 Warvelle, Vendors (2d ed.) § 936.

It was held in this state at an early day that the rule of damages against the vendors who had put it out of their power to convey would be the difference in the value of the land at the time the conveyance should have been made, and

the sum agreed to be paid for the land, if such value should be greater than the price fixed in the contract. *Hall v. Delaplaine,* 5 Wis. 206. That rule was followed in the more recent case where the vendor refused to give possession of the land as agreed, and wholly failed to perform the contract on his part. *Muenchow v. Roberts,* 77 Wis. 520, 522, 46 N. W. 802, 803. Mr. Justice LYON there, speaking for the court, said:

"The plaintiff is entitled to recover, if at all, the value of his bargain. The true measure of such value is the value of the land the defendant contracted to sell to him, estimated at the time the contract was broken, less what the plaintiff agreed to pay therefor. This is the general rule in this state in an action by a purchaser to recover damages for the breach of an executory contract to sell either real or personal property, where no part of the consideration has been paid."

That case seems to be in harmony with a prior case in which it was held that:

"One who executes a lease of a store, knowing that he cannot put the lessee in possession because another is in possession under a valid prior lease executed by himself and not yet expired, is liable to the second lessee for the whole loss proximately sustained by reason of the failure to put him in possession." *Poposkey v. Munkwitz,* 68 Wis. 322, 32 N. W. 35.

The opinion of the court in that case refers to the early English case cited as being "somewhat limited by later adjudications," and finally concludes with a lengthy quotation from Sutherland on Damages, substantially the same as quoted above, and then says:

"This quotation doubtless contains a correct statement of the law acted upon in all the states, as well in those which have adopted the rule in *Flureau v. Thornhill* [2 W. Bl. 1078], as in those which have not." *Poposkey v. Munkwitz,* 68 Wis. 327–329, 32 N. W. 35.

The ruling of this court in a very recent case is quite similar. *Gross v. Heckert,* 120 Wis. 314, 97 N. W. 952, 955.

In the case at bar it is admitted in the pleadings that, at the time the plaintiff made his contract with the defendants, they never had any title to any of the lands they therein agreed to convey to the plaintiff, except the timber and the right to remove the same from the lands, and they had previously conveyed nearly all of such timber to the Rogan Bros. They had secured to themselves the privilege of acquiring the title which they proposed to convey to the plaintiff, without the timber, at an advance of over $4,000 more than they were to pay for the land with the timber. The defendants expressly refused to convey the timber, and claim that they were not bound to do so by the terms of the contract. The authorities are to the effect that a vendor who has agreed to convey land which he knew at the time he had himself previously conveyed to another, or to which he had no title, is answerable in damages to his vendee for the loss of his bargain. In addition to the authorities cited above, see *Pinkston v. Huie,* 9 Ala. 252; *Gale v. Dean,* 20 Ill. 320; *Clagett v. Easterday,* 42 Md. 617; *Bryant v. Hambrick,* 9 Ga. 133; *Martin v. Wright,* 21 Ga. 504; *Irwin v. Askew,* 74 Ga. 581; *Chartier v. Marshall,* 56 N. H. 478. In some of these cases the vendor seems to have acted in good faith, but was nevertheless held liable in damages for the loss of the vendee's bargain.

In the case at bar the answer alleges that at the time of making the agreement with the plaintiff, and for some time prior thereto, the plaintiff had full notice and knowledge of the contract of the defendants with the Rogan Bros., and of the rights of all parties thereunder. Such notice and knowledge are denied and put in issue by the plaintiff. That issue remains undetermined. If upon the trial the defendants shall fail to establish their claim that the plaintiff, at the time he so entered into the contract with them, had such notice and knowledge of their prior contract with the Rogan Bros., then, obviously, under the authorities cited, they acted

in bad faith and would be liable in damages to the plaintiff for the loss of his bargain. If, on the contrary, it should appear that at the time of contracting with the defendants the plaintiff had such notice and knowledge, then, obviously, there was no fraud or deceit practiced upon the plaintiff in procuring the contract. The question recurs whether such knowledge of the plaintiff would deprive him of damages for the loss of his bargain. There are undoubtedly cases where the defect in the title is known to the vendee as well as the vendor, and where, in consequence of such knowledge, the vendor has been held to be relieved from responding in damages for the loss of the vendee's bargain. It was so held in Pennsylvania, where the fact was well known to both parties that the vendor had nothing but a life estate. *Rohr v. Kindt,* 3 Watts & S. 563, 565. In that case, however, the court held that, by the contract upon which the action was based, "the defendant bound herself to give the plaintiff a clear deed for the ten acres which she *held under the will"* there in question, and that both parties must have understood that the agreement of the vendor was only to convey her life estate. Seven years afterwards, in an action for the breach of an agreement to make and deliver "a good and sufficient deed, clear of incumbrances," the same court, unanimously, in an opinion written by the same justice, said:

"It is scarcely an open question that upon the refusal or inability of a vendor to execute a deed clear of all incumbrances, including the wife's dower, the vendee has a right of action to recover at least nominal, or, as the case may be, compensatory, damages. Nor will it alter the case that the contingent right of dower was *known to the vendee* when he bargained for the land, and that, as here, he covenanted to pay her ($5) for signing the deed. This cannot, as has been contended, have the effect of making him take the risk on himself. Nor does it excuse the vendor, so far as the right of action is involved, that he was willing and offered to comply with his covenant, and to make title as far as he was able without his wife's consent. The defendant covenants to make

the title free from all incumbrances, and this covenant is immediately broken on the refusal of the wife, from whatever cause, to become a party to the conveyance. Damages may be recovered for the loss sustained by reason of his failure to comply, arise from what cause it may, even though he may have failed *bona fide* and is unable to complete his contract on account of the default of another. And it is no excuse that his inability may have arisen from the refusal of the wife to sign the deed, although it may inevitably affect her interests. Courts of law can afford no more protection to wives than from the violation of other agreements. It would be attended with the most pernicious consequences if the doctrine should receive the sanction of the court that the refusal of the wife would free the husband from all damages arising from the violation of his covenant." *Bitner v. Brough,* 11 Pa. St. 127, 136, 137.

The opinion sanctions a charge to the jury to the effect that the vendor ought not to make anything by the violation of his agreement, and that the vendee ought not to lose anything by such violation. The jury returned a verdict of $1,000 damages, and this was sustained on the ground that there was evidence sufficient to justify a finding of bad faith on the part of the vendor, within the early English rule stated. That case has been sanctioned by the same court in numerous adjudications since. *McDowell v. Oyer,* 21 Pa. St. 417, 426; *Meason v. Kaine,* 67 Pa. St. 126, 132; *Riesz's Appeal,* 73 Pa. St. 485, 490; *Rineer v. Collins,* 156 Pa. St. 342, 348, 27 Atl. 28. See, also, *Drake v. Baker,* 34 N. J. Law, 358. According to such adjudication the mere fact that the vendee in a land contract, at the time of making the same, knew that the vendor did not have absolute title to the land, or that his title was incumbered, did not prevent him from recovering damages for the loss of his bargain by reason of the vendor's failure to convey title according to his agreement. For a much stronger reason, the vendee is not precluded from such recovery by the mere fact that at the time of making the contract he knew that the vendor had no

title to the land whatever, or a mere optional right to acquire
a title. As indicated, the authorities, both English and Amer-
ican, are to the effect that a vendor who agrees to convey what
he at the time knows that he has no right to convey, because
the title is in another, thereby assumes the risk of acquiring
the title and making the conveyance, or responding in dam-
ages for the vendee's loss of the bargain. As aptly stated by
Judge COOLEY in the quotation from the Michigan case cited,
"such contracts are speculative in character, and the party
giving them understands the risk he assumes when the cove-
nant is entered into." Such contracts for the future delivery
of personal property have frequently been characterized by
this and other courts as speculative in character. *Barnard
v. Backhaus,* 52 Wis. 593, 598, 6 N. W. 252, 9 N. W. 595,
and cases there cited. One of the definitions of "speculate"
is to "take the risk of loss in view of possible gain." Cen-
tury Dict.

As indicated, in the case at bar the defendants agreed to
convey to the plaintiff about 8,500 acres of land, with the
timber thereof, at $3 per acre, at a time when they had no
title to any of the land, nor to any of the timber thereon. To
fulfill that agreement, they assumed the risk of acquiring
title to the timber and the land. It may be inferred from the
answer that they afterwards acquired title to the land with-
out the timber, but there is no pretense that they acquired
back the timber which they had previously sold to the Rogan
Bros. In fact, they insist that the plaintiff must accept a
deed of the land without the timber in satisfaction of their
agreement to convey the land with the timber. In other
words, they insist upon violating their agreement to convey
the timber to the plaintiff, which they had previously sold to
the Rogan Bros. for $5,000. We are not aware of any rule
of law which prevents a vendee from recovering any legiti-
mate damages he may have sustained by reason of his
vendor's refusal to perform such solemn agreement. The

plaintiff in this case had the right to rely upon the agreement of the defendants to convey the complete title to the land and timber, even if he knew at the time of making the optional agreement that they had no title to either.

*By the Court.*—The judgment of the circuit court is reversed on the plaintiff's appeal, and the cause is remanded for further proceedings according to law.  The defendants take nothing by their appeal.

MARSHALL and SIEBECKER, JJ., dissent.

A motion by the defendants for a rehearing was denied June 10, 1904.